BALTIMORE & OHIO RAILROAD CO., ETC., ET AL. *v.*
PATRICK, ADMINISTRATRIX, ETC.

[No. 19,038. Filed April 22, 1960. Rehearing denied May 27, 1960. Transfer denied October 3, 1960.]

106

*James L. Beattey* and *Martz, Beattey & Wallace,* of Indianapolis, for appellants.

*H. Harold Soshnick,* of Shelbyville, *Aribert L. Young* and *Armstrong, Gause, Hudson & Kightlinger,* both of Indianapolis, for appellee.

MYERS, C. J.—This is an appeal from a judgment of the Shelby Circuit Court in an action originally brought by John O. Patrick against the appellants, asking dam-

ages for personal injuries suffered as the result of a collision between an automobile in which Patrick was riding as an occupant and a train operated by employees of the Railroad Company. Judgment was rendered in favor of Patrick against appellants in the sum of $15,000. Since the date of judgment, and prior to the perfection of this appeal, Patrick died of natural causes not related to the accident. By order of the Shelby Circuit Court, his sister, Sylvia M. Patrick, Administratrix of his Estate, was substituted as party appellee herein.

The material allegations set forth in appellee's decedent's amended complaint are substantially as follows: On January 5, 1954, at about 1:30 p.m., John O. Patrick (hereinafter called John) was riding as a passenger in a car being operated by Mary Patrick (hereinafter called Mary), his sister-in-law. The car was being driven on a county road in Jackson County, Indiana, across the tracks of appellant Railroad Company, which crossing was known as the "Shieldtown Crossing." At that time and place a train operated by employees of the Railroad Company negligently backed into and struck the car, causing injury to John. The Railroad Company was charged with negligence and carelessness in the following particulars: That it failed to sound the whistle on the engine distinctly not less than three times beginning not less than 80 rods east of the crossing; that it failed to sound the whistle on the engine repeatedly until the engine reached the crossing; that it failed to ring a bell continuously from the time the whistle sounded until the engine fully passed the crossing; that it failed to give any warning of the approach of the train which was "quietly" backing onto the crossing; that it failed to stop the train in time to avoid a collision upon seeing John at the crossing; that it failed to

keep a proper lookout; that it failed to keep the train under reasonable control as it approached the crossing; that it failed to keep proper warning signs or devices on the highway north of the crossing. It was alleged that all of said negligence proximately caused the collision which resulted in permanent injuries to John.

To this amended complaint, appellants filed three paragraphs of answer in which they denied the allegations, asserted affirmative defenses of contributory negligence on the part of both John and the driver, joint venture, and imputed negligence to the plaintiff John. They also stated that the issues had been determined in a previous lawsuit litigated in the United States District Court for the Southern District of Indiana, wherein a jury found in favor of the Railroad Company as a defendant and against Mary and Paul Patrick, her husband (hereinafter called Paul), as plaintiffs, based upon the same set of facts which is the subject-matter of this lawsuit. A reply in general denial was filed to these affirmative answers.

Upon the issues being thus joined, the cause was submitted for trial by jury. At the conclusion of the evidence certain interrogatories were propounded to the jury by appellants and answers to the same were returned. The finding and general verdict was given by the jury in favor of John in the sum of $15,000 and judgment was entered accordingly. Appellants filed their motion for a new trial, which was overruled, and this appeal followed.

A brief summary of the facts most favorable to the appellee show that Mary and Paul were husband and wife and residents of Indianapolis. They drove down to the little town of Surprise, Indiana, on January 4, 1954, because of the death of Paul's mother who lived there. They stayed overnight at the home place. Paul's

brother, John, appellee's decedent herein, was also there, having lived with his mother prior to her death. The morning of January 5th, John, Paul and a sister received friends and relatives at the house in Surprise. The body of the mother was at a mortuary in Seymour, Indiana. They were planning to go into Seymour to be at the mortuary around 2:00 o'clock. John had originally intended to drive in with his sister, but she departed early so he arranged to go with Paul and Mary. They left about noon, with Mary driving the car and the two men sitting in the front seat beside her, John being on the outside next to the door.

The distance from Surprise to Seymour is approximately eleven miles by blacktop road. After leaving the home place they decided to take a narrow county road which goes down along White River and is known as the "River Road." The reason they did this was because John wanted to show Paul a camp site along the river and they had time to spare before they were due at the mortuary. They made a short stop of about five minutes' duration along the river and the two men got out of the car and looked around. They then re-entered the car and started toward Seymour.

There was a 360-feet-long covered bridge which crossed White River along this road. It was constructed of wood, with wooden planks as flooring. Some of the planks were not fastened down and were loose. The direction of the bridge was north-south. The road led to the crossing of the railroad tracks belonging to appellant Railroad Company. The distance from the south end of the bridge to the tracks, which ran in an east-west direction, was 153 feet. This was known as the "Shieldtown Crossing."

Mary drove the car through the bridge at a speed of approximately 15 to 20 miles per hour. At the same

time, the employees of appellant Railroad Company were operating a train consisting of two freight cars, a caboose, and a steam locomotive, traveling westward from Seymour to Brownstown on the tracks leading to the Shieldtown Crossing. The cars were coupled to the head end of the locomotive, which was pulling them in reverse. The coal tender was the lead end of the train as it went down the tracks. A fireman and engineer, appellants herein, were in control of the engine, which was traveling at a speed of between 15 and 20 miles per hour.

When the automobile with the Patricks emerged from the bridge, the train was to their left, approximately 150 feet away from the crossing. Both the train and the car arrived there at the same time, with the result that there was a collision, and all the Patricks were injured thereby. While the sun was not shining, the day was clear and visibility was good. There was a partially clear view to the east from the south end of the bridge, and the jury specifically found that if John had looked to his left or to the east when they came out of the covered bridge, the train would have been within view. However, Mary testified that the first time she saw the train was when she was on the tracks at the crossing just before it struck. She looked to her left and saw a "wall of steel." The engineer testified that the first time he was conscious of an accident was when he heard the crash and saw the car come from behind on his side. The fireman likewise testified that he never saw the automobile before it was struck. Both the engineer and the fireman were sitting facing the rear of the train due to the fact that the locomotive was backing at the time. In order to see the track before them they had to turn their heads and look out the cab windows.

In their motion for new trial appellants allege that error was committed by the trial court in sustaining appellee's motion to withdraw from submission to the jury the affirmative allegation of defense set up in appellants' third paragraph of answer; in excluding from evidence certified copies of the proceedings in the United States District Court for the Southern District of Indiana; in overruling appellants' motion for a directed verdict at the conclusion of plaintiff's evidence; in overruling appellants' motion for a directed verdict in favor of appellants at the conclusion of all the evidence; in the giving of certain instructions tendered by the plaintiff; and in refusing to give certain instructions tendered by the defendants. They also claimed that the verdict was not sustained by sufficient evidence and was contrary to law; that it was in irreconcilable conflict with the answers to interrogatories made by the jury; and that the damages were excessive. In their assignment of errors appellants claim that error was committed in overruling the motion for a new trial, in refusing to give defendants' tendered Instruction No. 70, and in giving the court's Instruction No. 34.

At the close of the trial certain interrogatories were propounded to the jury by appellants, and answers were given thereto. The pertinent interrogatories and answers as contained in the Argument section of appellants' brief are as follows:

"15. Was the plaintiff aware that a railroad crossing was immediately ahead of the vehicle after coming out of the covered bridge?

"Yes.

"17. Was the whistle on the engine blown prior to the time of entering the intersection of the Shieldtown Road and the Baltimore and Ohio track?

"Yes.

"18.  Was the bell ringing?

"Yes.

"19.  Was the headlight on the engine burning?

"We do not know whether the headlight on the engine was burning or not, but according to the testimony given the light on the tender was burning.

"22.  Was there a clear view to the east, the direction from which the train was approaching, to a traveler traveling south upon said county road, including the plaintiff?

"Partially clear.

"25.  Did the driver of the automobile stop the automobile prior to proceeding into the intersection of the railroad and the county road?

"No.

"28.  At a point 153 feet north of the intersection, how much vision to the east along the railroad track did the plaintiff have?

"According to the testimony of the plaintiff, he did not look toward the east.

"29.  At a point 78 feet north of the railroad crossing how much vision to the east along the railroad track did the plaintiff have?

"The plaintiff stated that he did not look toward the east, therefore, he had no vision in that direction.

"30.  At a point 46 feet north of the railroad crossing how much vision did the plaintiff have to the east along the railroad track?

"Same answer as above.

"32.  Was the train within view of the plaintiff at the time the plaintiff came out of the covered bridge?

"It would have been in view if plaintiff had been looking in that direction."

It is claimed by appellants that John was guilty of contributory negligence as (1) a nonpaying guest and as (2) involved in a joint venture, wherein the operator

of the car was guilty of contributory negligence which was imputed to him.

The record is clear that John did not pay either Paul or Mary compensation of any nature for the ride to Seymour. As a passive guest he owed the duty of ordinary care to avoid danger. His duty was that of the ordinarily prudent person under like or similar circumstances at the time of the injury. *Morley* v. *C., C., C. & St. L. R. R. Co.* (1935), 100 Ind. App. 515, 194 N. E. 806. The jury found that he did not look to the east after they came out of the covered bridge, and that if he had looked in that direction the train would have been in view. It did not indicate that he failed to look at a time when an ordinarily prudent person would have looked, and that such failure to look was the proximate cause of the accident. It was a question of fact as to whether under the circumstances he used reasonable care. The question becomes a question of law only when the facts are such that reasonable men can draw but one conclusion therefrom. *Lindley* v. *Sink* (1940), 218 Ind. 1, 30 N. E. 2d 456. By its general verdict the jury did not find this to be the case. We must assume therefore that the jury found that John exercised due care as a guest. *Grand Trunk, etc., R. Co.* v. *Reynolds* (1911), 175 Ind. 161, 92 N. E. 733, 93 N. E. 850. Merely because he did not look to the east, under the circumstances, is not sufficient to charge him with contributory negligence as a matter of law. *Pennsylvania R. R. Co.* v. *Hemmer, Admx.* (1934), 206 Ind. 311, 186 N. E. 285, 189 N. E. 137.

Appellants state that John's true status was that of being engaged in a joint venture with Mary and his brother, Paul; that Mary was negligent in the operation of the automobile as a matter of law, which negligence proximately caused the accident and the resulting in-

juries, and that her negligence is imputed to him, thus barring recovery. It is claimed that John exercised joint control of the car with Mary, and that the specific findings of the jury in its answers to the interrogatories constitute a positive finding of negligence upon the part of Mary as a matter of law.

The facts are not as clear-cut as appellants would have them. There was testimony by the engineer and the fireman of the train that there was a clear view of the crossing as they approached it from the east. However, they both said that they did not see the car until after the train had struck it. The engineer was operating the locomotive, and said that the way he was sitting his back was to the crossing; that in order to see out of his side of the engine when it was being run backward he had to poke his head out the window, and he could not remember if he stuck his head out at the time he entered the crossing. The fireman testified that he called the block to the engineer when they were about 300 feet from the crossing, and that he might have taken his eyes off the crossing, after he called the block, to check the steam gauge. He further stated that except for the time he might have looked at the steam gauge he was looking westward throughout the 300 feet distance. He also testified that during the 300 feet distance he never did see the automobile in which John was riding, although he saw the bridge as he approached the crossing. The engineer was confused in his testimony as to whether he blew the whistle. There were conflicting statements by him that he blew it at the crossing, before the crossing, at the whistle post, or "near" the whistle post. That post was about 1400 or 1600 feet from the crossing. The occupants of the car and two other witnesses said they did not hear any whistle blown or bell ringing. In so far as the occu-

pants of the car were concerned, the jury could have found that the whistle was blown at the time they were driving through the covered bridge and that the noise made in traveling over the loose floor boards of the bridge could have prevented them from hearing it.

There was much conflict in the evidence as to whether there was sufficient warning given by those operating the train prior to the collision. The question of negligence, proximate cause, and contributory negligence therefore were questions of fact for the jury after proper instructions. *Kempf* v. *Himsel* (1951), 121 Ind. App. 488, 98 N. E. 2d 200. In spite of the fact that the jury found specifically that the whistle had been blown at some time prior to the train's entering the crossing, that the bell was ringing, that the light on the tender was burning, that Mary did not stop prior to proceeding into the intersection, and that she had observed the crossing ahead of her as they emerged from the covered bridge, the evidence and all reasonable inferences therefrom was such that the jury could have found that the appellants were negligent, which negligence was the proximate cause of the collision.

In *Cushman Motor Delivery Co.* v. *McCabe, Admr.* (1941), 219 Ind. 156, 174, 36 N. E. 2d 769, 776, the court said as follows:

> "This court has many times said that contributory negligence is ordinarily a question of fact for the jury, and that it is only in cases *where the facts are undisputed and where only a single inference can be reasonably drawn therefrom* that this court can say, as a matter of law, that a certain course of conduct does, or does not, constitute contributory negligence. *Inland Steel Co.* v. *King* (1916), 184 Ind. 294, 110 N. E. 62." (Our emphasis.)

We do not find that the record is such that Mary as driver of the car was guilty of contributory negligence as a matter of law, which negligence proximately caused the accident.

Even assuming that such negligence on the part of the driver could be found as a matter of law, the record does not clearly show that John was bound by it as having joint control over the operation of the automobile or as being engaged in a joint venture. There is no question but that negligence of the driver of a motor vehicle may be imputed to the passenger where the passenger controls, or has a right to control, the movement of the vehicle in which he is riding, or where the driver and passenger are engaged in a common enterprise, or where the driver is engaged in an enterprise of any kind for the use and benefit of the passenger and is subject to the passenger's control. There must be a unity of interest in the object of the journey, and agreement between the parties either express or implied, and an equal right to direct and govern the movements and conduct of each other in respect thereto. *Burks* v. *Walters* (1957), 127 Ind. App. 358, 141 N. E. 2d 872; *Jones* v. *Kasper* (1941), 109 Ind. App. 465, 33 N. E. 2d 816; *Spencer* v. *Pettibone* (1947), 117 Ind. App. 426, 70 N. E. 2d 439; *Lee Brothers* v. *Jones* (1944), 114 Ind. App. 688, 54 N. E. 2d 108.

Here again the evidence is conflicting. John had originally intended to drive into Seymour with his sister, but she left early, so he "just decided" to drive in with his brother and sister-in-law. Because there was time to spare, they turned off the blacktop road after they left Surprise and took the more roundabout River Road. John testified that he wanted to show the others some old homes down that way where his family had been born; that it was a "sentimental choice"; that he also

wanted to look at a cabin site and see what it was worth. He stated several times that nothing was said in the car as to which way to turn. When they stopped it was to look at the cabin site. In so doing, he and his brother got out of the car for about five minutes and walked to the river's edge while Mary remained in the car.

Mary's testimony was contradictory as to who directed her down the River Road toward the bridge and as to the brothers' conversation about the camp site. She admitted that she was unfamiliar with the road and that they stopped prior to crossing the bridge at her husband's request; that she drove on without instructions because she knew the general direction in which they were headed.

Paul testified that he gave all the directions to his wife on the trip, but that John had said, "we'll just go down through here," meaning the River Road, because John wanted to show him a cabin site. There was some testimony that John had wanted to stop at a house located on the other side of the Shieldtown crossing occupied by some people named Arbuckle. However, both Paul and his wife stated that they had no interest in stopping there, nor had they any interest in the cabin site whatsoever.

From this confusing evidence, the jury concluded in its answers to the interrogatories that both John and Paul selected the route and instructed Mary which roads to take and where to stop in the course of the journey, and that the purpose of the stop made prior to the accident was to look at a camp site. There was no indication as to what the purpose of the deviation was at the time they left the blacktop road, the jury finding only that when they stopped it was to look at a camp site. From the evidence, it was obvious that Mary was

not interested in the camp site, but only stopped to convenience John, her husband, or both.

The ultimate purpose of the drive was to be present at the funeral parlor in Seymour at 2:00 o'clock p. m. There is nothing in the record tending to show that John had or undertook to exercise control over Mary when they started in that direction. She testified that she knew the blacktop road, having driven over it into Seymour the night before. Even though John and Paul directed her down along the River Road, the jury could have found that there was not sufficient evidence that John had an equal right to govern her movements and conduct prior to the accident.

Furthermore, the facts do not reveal a community of interest in the object of the trip and side-trip in so far as Mary was concerned. It is not suggested that Mary made the trip to Surprise and subsequently to the funeral parlor in Seymour for any reason other than her normal desire to be with her husband in time of grief. If the purpose of the side-trip was to look at a camp site at John's request, it was of no particular interest to her.

Thus, we do not find from the evidence in the record that the facts or reasonable inferences drawn therefrom warrant the conclusion as a matter of law that there was a joint enterprise and joint control over the automobile by John.

As ground No. 7 for their motion for new trial, appellants state:

"That the verdict is in irreconcilable conflict with the answers to interrogatories made by the jury."

This is not a proper ground for motion for new trial. In Flanagan, Wiltrout & Hamilton's *Indiana Trial and Appellate Practice* (Supp.), § 1691, Comment 2, page 71, the following statement is made:

"No question is preserved as to whether there should be a judgment on the interrogatories unless there is a motion for such a judgment. A specification in a motion for new trial 'that the verdict is contrary to the answers to interrogatories' presents no question on appeal. *Hinds* v. *McNair* (1955), 235 Ind. 34, 129 N. E. 2d 553."

In this case the record does not reveal that appellants made a motion for judgment on the answers to the interrogatories, notwithstanding the general verdict. Thus, this ground of error presents no question.

Appellants did claim that the verdict was not sustained by sufficient evidence. In passing upon this point, the answers of the jury will be considered by this court and will be accepted as establishing the facts therein found unless wholly unsupported by the evidence. *Chicago, etc., R. Co.* v. *Barger* (1924), 82 Ind. App. 266, 144 N. E. 646. Every reasonable presumption must be indulged in favor of the general verdict when determining whether there is a conflict between the answers and the verdict. *Tribune-Star Publ. Co.* v. *Fortwendle* (1954), 124 Ind. App. 618, 115 N. E. 2d 215, 116 N. E. 2d 548. The general verdict is conclusive unless there is a substantial conflict in some material particular between it and the facts found which cannot be reconciled. *Neuwelt* v. *Roush* (1949), 119 Ind. App. 481, 85 N. E. 2d 506.

Numerous acts of negligence were alleged in the complaint. Some of the facts found by the jury were in denial of these acts. However, there were no interrogatories covering the facts involved as to all the allegations of negligence. None were submitted as to where and in what manner the whistle on the engine was sounded when it approached the crossing, or whether appellants kept a proper lookout, or whether they failed

to keep the train under reasonable control when approaching the crossing. In spite of the special findings by the jury, we cannot say that they add up to such negligence on the part of John or Mary as to warrant the conclusion that either or both of them were guilty as a matter of law of contributory negligence which proximately caused the collision. We do not find that there was irreconcilable conflict between the special answers and the general verdict of the jury. There was sufficient evidence, together with all reasonable inferences therefrom, which could have supported the jury's verdict against appellants.

Appellants have taken issue in their motion for new trial and assignment of errors with certain instructions which were given by the court and others which were tendered but not given by the court. In that portion of their brief designated as Concise Statement of the Record they set forth instructions as follows: "Court's Instructions to the Jury." They then commence with "Instruction No. 1" and proceed to set forth in numerical order thereafter the instructions up to and including No. 63. In their presentation of these instructions, certain of them have an asterisk in front of the instruction number. At the bottom of the instruction another asterisk is followed by parentheses wherein it is stated "Plaintiff's Instruction" No. so-and-so, "Defendants' Instruction" No. so-and-so, or "Court's Instruction" No. so-and-so, with reference to transcript pages after each. In the motion for new trial error is claimed as follows:

> "11. The Court erred in giving, over the objections of the defendants, each of the Instructions numbered 1, 4, 6, 7, 8, 12, 13, 16, 18, 27, 34 tendered by the *plaintiff*." (Our emphasis.)

In the Argument part of their brief, appellants take issue with the *Court's* Instructions Nos. 22, 18, 10, 16,

and 6. These are designated in argument as actually being *plaintiff's* tendered Instructions Nos. 34, 18, 6, 16, and Court's Instruction No. 1, respectively. At the beginning of their argument on Error in Instructions, appellants state in their brief as follows:

"As we have previously pointed out, we propose to show the Court the error in the instructions given by the Court. In our assignment of errors we have cited the Court's Instruction No. 34 as error. This in fact is plaintiff's tendered Instruction No. 34, which is in reality Court's Instruction No. 22. In view of the fact that this instruction has generally been assigned as error in our Motion for New Trial, we feel that the error in our assignment of errors is harmless; therefore, we will consider Court's Instruction No. 22, as shown in the Transcript herein on page 765 instead of Court's Instruction No. 34."

We do not feel that the error assigned in the assignment of errors is harmless, for the reason that the instructions tendered by the plaintiff and objected to by appellants are differently numbered from those claimed in the brief to have been given by the court. Without searching the record, there is no way for this court to know whether *Court's* Instructions Nos. 22, 18, 10, 16, and 6 are identical and the same as *plaintiff's* tendered Instructions Nos. 34, 18, 6, 16, and *Court's* Instruction No. 1. It is well established that we will not search the record to reverse. There being nothing presented in appellants' brief that the giving of *Court's* Instructions Nos. 22, 18, 10, 16, and 6 was objected to in the trial court, the fact that an asterisk refers to a plaintiff's, defendants' or court's instruction in parentheses at the bottom of these instructions, labeled "Court's Instructions," is not sufficient to identify them as being one and the same. There must be specific objections made to questioned

instructions before argument. Supreme Court Rule 1-7; *City of Logansport* v. *Gammill* (1957), 128 Ind. App. 53, 145 N. E. 2d 908.

Appellants tendered certain instructions designated as *defendants'* Instructions Nos. 2, 27, and 30 through 73. They claim error in the trial court's refusal to give them. However, they assign no specific reasons for giving any of them except to say in general that they are correct statements of the law and necessary to properly advise the jury on the basis of the issues and evidence presented. These reasons are too general to preserve a question on appeal. *Powell* v. *Ellis* (1952), 122 Ind. App. 700, 105 N. E. 2d 348; *McCoy et al.* v. *State* (1958), 237 Ind. 654, 148 N. E. 2d 190.

Appellants offered and tendered a motion for a directed verdict in favor of the defendants at the conclusion of plaintiff's evidence. They claim error in the court's overruling that motion. This ground of error is waived by appellants, as they proceeded to introduce evidence after the motion had been overruled. *Taylor* v. *Fitzpatrick* (1956), 235 Ind. 238, 132 N. E. 2d 919.

Error is charged in overruling defendants' motion for a directed verdict at the conclusion of all the evidence. As has been previously pointed out, the evidence in this case was conflicting. This court will not weigh the evidence, but examines the record only to determine if there is any evidence or reasonable or logical inferences therefrom which will sustain the verdict. We are of the opinion that there was sufficient evidence, together with all inferences to be drawn therefrom, wherein the jury could have found against appellants and in favor of appellee. *New York,*

*Chicago & St. L. R. Co.* v. *Mercantile Nat. Bank* (1960), 130 Ind. App. 638, 165 N. E. 2d 382.

It is further contended that the court erred in withdrawing from submission to the jury the affirmative allegations of defense set up in defendants' third paragraph of answer, which concerned a previous trial which took place in the United States District Court for the Southern District of Indiana, wherein Paul and Mary sued the appellant Railroad Company for damages for personal injuries suffered as a result of the collision herein involved. A jury was alleged to have returned a verdict in favor of appellant Railroad. It is charged that John had a beneficial interest in the outcome of that lawsuit in that as a passenger he was in the position of being a principal to Mary, who, as the driver of the car, acted as his agent, and that her negligent acts were imputed to him thereby. The judgment of the District Court, which was not appealed, is asserted to be in estoppel and bar to recovery by John on the basis of *res judicata*. In connection with this, appellants claim error in the trial court's refusal to allow the introduction in evidence of certified copies of the proceedings which were a part of the record in that case, being identified as Defendants' Exhibits T, U, and V. Error is also claimed in the giving of Instruction No. 6, which withdrew the third paragraph of answer from the jury.

We do not consider Instruction No. 6 because of what has been previously said about these instructions. It is noted that in the Argument section of their brief, appellants claim it to be plaintiff's Instruction No. 1, while in the Concise Statement of the Record it is purported to be Court's Instruction No. 1, thus adding to the confusion in regard to the instructions.

.The fact that the trial court overruled a demurrer to this third paragraph of answer and then later withdrew it from submission to the jury is of no consequence, as the trial court in its discretion during the proceedings had the right to reconsider its ruling, vacate it and make a contrary ruling. *The First National Bank of Huntington* v. *Williams et al.* (1891), 126 Ind. 423, 26 N. E. 75; *Maley* v. *Citizens Nat. Bank* (1950), 120 Ind. App. 642, 92 N. E. 2d 727.

A plea of former adjudication is available only when there is privity and mutuality of estoppel. Only parties to a former judgment or their privies may take advantage of a former judgment or be bound by it. A party is one who is directly interested in the subject matter, had a right to make a defense, to control the proceeding, and to appeal from the judgment. *Tobin* v. *McClellan* (1947), 225 Ind. 335, 73 N. E. 2d 679, 75 N. E. 2d 149.

John was not alleged to have been a party in the federal court proceedings, nor is there anything to indicate that he was more than a witness at the trial therein. This of itself is not material. *Tobin* v. *McClellan, supra* (on petition for rehearing).

The jury in this case did not specifically find that John and Mary were acting in a principal-agent relationship. Even if it might have so determined, by its general verdict it did not find that Mary was guilty of contributory negligence so as to make John liable therefor. There was no error in withdrawing the third paragraph of answer from submission to the jury, and in sustaining the objections to the introduction of defendants' Exhibits T, U, and V in evidence.

Finally, appellants urge that the damages awarded were excessive. In personal injury cases a new trial will

not be granted for excessive damages unless they are so excessive as to indicate that the jury acted from prejudice, passion, partiality, corruption, or considered some improper element. *Chicago & Calumet District Tr. Co.* v. *Stravatzakes* (1959), 129 Ind. App. 337, 156 N. E. 2d 902.

The evidence showed that John sustained an injury to his head, that his hearing was affected, that his balance and equilibrium were faulty, and that such conditions were permanent, all of them having been caused by the accident. It was stipulated that his life expectancy was 15.62 years. It appeared that he had earned an average of $1,000 to $1,200 a year from 1951 through 1955, and that he had a government pension. Under these circumstances, we do not think that the damages assessed by the jury were excessive.

There being no error in the record, this judgment is affirmed.

Ax, Cooper and Ryan, JJ., concur.

NOTE.—Reported in 166 N. E. 2d 654.